**Trina Linnette DAVIS, Plaintiff,**

v.

**FIRST UNION CORPORATION LONG TERM DISABILITY PLAN, Defendant.**

**No. CIV.A.99–30277–MAP.**

United States District Court,
D. Massachusetts.

Aug. 12, 2002.

Judd L. Peskin, Weiner & Rothschild, Springfield, MA, for Trina Linnette Davis, Plaintiff.

Kenneth J. DeMoura, Adler, Pollack & Sheehan, P.C., Boston, MA, for First Union Mortgage, Defendant.

*MEMORANDUM REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

PONSOR, District Judge.

#### I. *INTRODUCTION*

In this case, the plaintiff, Trina Linnette Davis ("plaintiff"), who suffers from multi-

ple sclerosis, claims that she was wrongly denied long-term disability benefits in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* The defendant, First Union Corporation Long Term Disability Plan ("defendant"), contends that plaintiff was not eligible to participate in its disability plan because she had not been "actively employed" for three months, as the plan requires, when she became disabled. For the reasons set forth below, defendant's motion for summary judgment will be allowed.

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

Plaintiff was first diagnosed with multiple sclerosis in 1993. (Docket 49, Exhibit B at 8). Nevertheless, she was able to overcome her health problems and to work productively until at least 1998. *Id.* at 2. Beginning in 1995, plaintiff began working as a loan originator, or loan officer, for several banks and mortgage companies. *Id.* In 1995, plaintiff worked with Fleet Mortgage Company, and in the summer of 1996, plaintiff moved to National City Mortgage Company ("National City"). *Id.*

After approximately a year with National City, plaintiff began discussing the possibility of employment with First Union Mortgage Corporation ("First Union"). (Docket 64, Exhibit A at 17). First Union's sales manager at the time, Nanette Cavaleri ("Cavaleri") was "immediately impressed" with plaintiff, and found her to be "[v]ery stylish, classy, well spoken." *Id.* Plaintiff also showed Cavaleri that she was a good loan officer because plaintiff was writing "at least eight to ten loans a month" with National City. *Id.* Cavaleri made plaintiff an offer and plaintiff accepted. *Id.* at 18.

Plaintiff officially starting working with First Union on October 27, 1997. (Docket 49, Statement of Facts at 1). In 1997,

First Union provided long-term disability benefits to its employees through defendant, the First Union Corporation Long Term Disability Plan ("defendant"). *Id.* The terms of the Plan were described in a document entitled "First Union Corporation Long Term Disability Plan," (the "Plan"), and summarized in a document entitled "Summary Plan Description" ("SPD"). The provisions of the Plan most crucial to the present dispute center around eligibility. The Plan provides that,

> Each ... Employee shall be eligible to become a Participant in the Plan on the first day he or she is physically at work on or after the date on which he or she completes three months of Active Employment.
>
> Coverage for an Eligible Employee shall commence on the date the Eligible Employee becomes a Participant; provided, however, that coverage will be delayed for an Eligible Employee if he or she is not in Active Employment because of Injury or Sickness. Such coverage shall commence on the date the individual returns to Active Employment.... Whether an Eligible Employee becomes a Participant (and when coverage commences) shall be determined by the Plan Administrator in its sole discretion.

(Docket 35, Exhibit 1 at 7–8). Thus, given her start date of October 27, 1997, plaintiff was due to become eligible for long-term disability benefits on January 27, 1998, provided that she had completed three months of "Active Employment" by that date uninterrupted by "Injury or Sickness."

In its "Definitions" Section, the Plan provides further illumination. It states that,

> "Active Employment" means the Employee must be actively at work for the Participating Employer on a full-time or a part-time regularly scheduled basis

and paid regular earnings and perform such work either (i) at the Participating Employer's usual place of business, or (ii) at a location to which the Participating Employer's business requires the Employee to travel.

*Id.* at 1. It further states that,

"Sickness" means illness, disease, pregnancy or complications of pregnancy.

*Id.* at 6. Obviously, multiple sclerosis is a "sickness" within the meaning of the Plan. As discussed in more detail below, defendant claims that plaintiff was ineligible for long-term disability benefits because she had not completed three months of "active employment" when she became disabled.

A few words about plaintiff's responsibilities with First Union, and the expectations placed upon her, are necessary. First Union hired plaintiff to develop a new territory in Western Massachusetts where First Union had previously not conducted business. (Docket 64, Exhibit C at 19). Plaintiff was never told that she was expected to work a forty hour week, and First Union did not require employees to use a punch clock. *Id.* at 26.

On the other hand, plaintiff knew that in the mortgage industry, it was not uncommon to work from eight o'clock in the morning to nine o'clock at night. *Id.* Plaintiff was expected to continually market herself and to work to develop new loans. She understood that her supervisor could keep track of whether she was working by seeing how many loans she had closed. *Id.* at 27. As plaintiff explained,

Always your time should be spent marketing yourself or else you're not going to be closing any loans. So if I don't come into the office and I sat at home and I didn't work, then I wouldn't have any business after a while. And then the company would know, she must not be working.

*Id.* As noted, plaintiff had been writing eight to ten loans a month with National City when she was hired by First Union.

Plaintiff, like other loan officers for First Union, was expected to spend most of her time out of the office, "on the road." *Id.* at 11. In general, an officer was expected to (1) make appointments and meet with realtors; (2) make appointments and meet with customers interested in buying a home; (3) hand out pamphlets and distribute other advertising; (4) set up seminars; and (5) complete the paperwork associated with a loan. *Id.* at 12, 31. A great deal of this work could be completed from home. *Id.* at 16–17. Officers could write up loans at home, make phone calls, and even meet with clients at home. *Id.* Indeed, at least one officer had a home office equipped with a fax machine, laptop, and phone line. *Id.* at 17. However, officers were expected to be in the Bloomfield office for sales meetings, training seminars, and some client meetings. *Id.* at 16.

Defendant does not dispute that in November and at least the first part of December, plaintiff was "actively working." Plaintiff familiarized herself with the area, made contacts with realty offices, and generally kept busy developing new loan avenues. (Docket 64, Exhibit C at 22). She also periodically dropped by the office as expected. *Id.* at 25.

Unfortunately, in December, 1997, plaintiff developed flu-like symptoms, and began to experience fatigue. *Id.* at 28. Although plaintiff felt tired, she also felt that she could put in an eight-hour day if she had to. *Id.* at 29. Plaintiff described December as the "slow season," however, and indicated that an eight-hour day was rarely necessary or appropriate. *Id.*

By the middle of January, 1998, plaintiff's multiple sclerosis began to flare up more seriously. *Id.* at 30. She experienced paralysis on the left side of her

body, the vision in her left eye was unfocused, and she lost control of her bladder. *Id.* The bladder problem, in particular, made it impossible for plaintiff to drive in to the office, or to drive to meet realtors or potential new customers. *Id.* at 31. Plaintiff felt that January–February was also "a dead time for realty," however, and that her debilitation did not cause her any real "down time." *Id.* at 35.

On January 8, 1998, plaintiff was unable to attend a sales meeting at the office. (Docket 64, Exhibit A at 47). Plaintiff called and explained that her multiple sclerosis was affecting her bladder and therefore her ability to drive. *Id.* at 31–32. The same day, plaintiff saw Dr. Lawrence Melz for an examination. *Id.* at 54. She told Dr. Melz that she had lost the vision in her left eye, had no control over her bladder, had acute muscle spasms, and was experiencing fatigue. *Id.* at 56.

Plaintiff received a note from Dr. Melz, and sent it along with her own letter to Cavaleri at First Union on January 16, 1998. In the first paragraph of the letter, plaintiff wrote the following about her condition:

> I was diagnosed with Multiple Sclerosis in 1994. I was told that it was dormant and not to worry [because] the possibility of having an attack was minute. I did have an attack last year during the late spring to summer months but I recovered and never had to cease work. This time however is quite different. I have lost vision in my left eye and therefore unable [sic] to drive. I have no control of my bladder and I have acute muscle spasms at random. For those reasons I am unable to work. I am restricted to bed rest because of the fatigue that is also associated with my illness.

(Docket 35, Exhibit 11). It should be noted that although the letter said, "I am unable to work," a fair reading of the letter shows plaintiff did *not* mean: "I am unable to work entirely." The next few paragraphs of the letter discuss plaintiff's efforts at work, and give no indication that plaintiff had completely ceased to work as of January 16, 1998. *Id.*

As noted, plaintiff attached to her January 16th letter a note from Dr. Melz, dated January 12, 1998. It stated:

> This is to advise you that, Trina Davis, is under my medical care for Multiple Sclerosis and was advised to remain out of work until she is seen again on February 2, 1998.

*Id.*, Exhibit 12 at 1. Dr. Melz followed up with a second letter on February 3, 1998, which stated:

> This is to advise you that my patient, Trina Davis, is under my medical care for Multiple Sclerosis. She was advised to remain out of work until she is re-evaluated on March 9, 1998.

(Docket 49, Exhibit C at 2). Plaintiff did not see Dr. Melz between January 8, 1998, and February 2, 1998. (Docket 64, Exhibit C at 53).

Despite her symptoms, plaintiff was able to continue to work from home, at least somewhat, between January, 1998 and February, 1998. Notably, on January 7, 1998, plaintiff took a loan from Craig Wilde, and that loan closed on February 17, 1998. *Id.*, Exhibit A at 72. An affidavit from Wilde confirms that plaintiff spent several hours with Wilde working on the loan application, that Wilde stopped by plaintiff's home to drop off or sign documents, and that the two spoke at least twice a week. *Id.*, Exhibit E.[1]

---

1. Plaintiff conceded that this was the only loan she brought in to First Union during the entire period of her employment that closed, and that she was not present at the closing. (Docket 64, Exhibit C at 77).

Plaintiff continued to receive daily faxes from the office in January, *id.,* Exhibit C at 95, and plaintiff sent out nine work-related faxes between January 19 and January 30. *Id.* at 117. An affidavit from Carol Albano ("Albano") of Sears Real Estate ("Sears") confirms that plaintiff faxed copies of First Union's daily rate sheet to Sears throughout January and into February, that Albano faxed information related to an ongoing transaction to plaintiff, and that plaintiff returned Albano's calls on several occasions.[2] *Id.,* Exhibit F. Overall, plaintiff maintains that she worked to her "fullest capacity" throughout December, January, and in the first part of February. (Docket 64, Exhibit C at 111).

Despite these efforts, the last day plaintiff was recorded as being physically at the office was December 22, 1997. *Id.,* Exhibit B at 42. Defendant consequently maintains that December 22, 1997, was plaintiff's last day of active work. *Id.* at 43. In further support of this position, defendant notes that plaintiff never picked up the laptop computer that was waiting for her, although a laptop would have certainly been helpful to a loan officer working at home. *Id.,* Exhibit A at 34–35.

Plaintiff notes that in February, she was told that she should no longer engage in any work from home. (Docket 64, Exhibit C at 83–84.) A First Union representative told plaintiff over the phone that because plaintiff was receiving short-term disability, she would not be permitted to work until her doctor reported that she was permitted to resume her responsibilities. *Id.*

On August 13, 1997, plaintiff submitted an application for long-term disability benefits, accompanied by a statement from Dr. Metz. (Docket 35, Exhibit 2). Plaintiff listed December, 1997 as the "Date Injury/Illness began," December, 1997 as the "Date First Treated," and February 1, 1998, as the "Date Last Worked." *Id.* Plaintiff described the onset and nature of her illness in the following way: "I suffer with MS. I had a severe exacerbation in December of 1997 with the loss of mobility, etc. From that point on I suffer daily w/loss of muscle control, bladder and immobility." *Id.* Plaintiff subsequently explained that she picked February 1, 1998 as her last day of work because although she knew she had worked in February, she was not sure which day in February was her last. (Docket 64, Exhibit C at 100).

On August 20, 1998, Liberty Mutual sent plaintiff a letter indicating that plaintiff's claim for long-term disability benefits was approved.[3] (Docket 35, Exhibit 3). However, on October 10, 1998, Liberty Mutual sent plaintiff a letter informing her that it had approved her claim erroneously and would immediately terminate her benefits. *Id.,* Exhibit 4. The letter declared that plaintiff had not actively worked for First Union for the requisite three months, and noted the following facts:

> On January 8, 1998 you failed to appear for a meeting scheduled in the office to discuss changes in your assigned territory, your production levels and your 1998 business plan.
>
> On January 16, 1998, you wrote a letter to your manager, Nanette Cavaleri, and advised Ms. Cavaleri that you missed the January 8, 1998 meeting because you suffer from multiple sclerosis and

---

2. It appears that Sears worked with plaintiff on the Wilde loan. (Docket 35, Exhibit 5 at 172).

3. First Union contracted with Liberty Mutual to provide and manage its long term disability benefits beginning January 1, 1998. Thus, plaintiff's correspondence regarding her benefits in 1998 was with Liberty Mutual, rather than defendant. Neither party in this case has disputed that defendant was properly named.

were restricted to bed rest and unable to work. You attached a letter dated January 12, 1998, from neurologist, Lawrence N. Metz, M.D. in which he wrote that you were advised to stay out of work until he saw you on February 2, 1998. On January 28, 1998, you returned a Health Care Provider Certification in which Dr. Metz wrote that you were unable to perform work of any kind.

You have not returned to work since December 22, 1997.

*Id.* The letter also stated that:

We contacted Dr. Metz and he stated that your disability began on January 12, 1998. That is consistent with Dr. Metz's letter dated January 12, 1998, that you provided First Union on January 16, 1998, and with the Health Care Provider Certification you submitted on January 28, 1998.

*Id.* Finally, the letter offered a small concession, allowing that "we will not request repayment of the benefits you received in error." *Id.*

Plaintiff appealed on October 20, 1998, asserting that the facts in Liberty's Life's letter were "not all accurate." *Id.*, Exhibit 6. Plaintiff declared that she had been working from home until February 17, 1998. *Id.* In great detail, plaintiff noted that she had kept contact with her clients and sales leads, had conducted mass advertisement mailings, had corresponded with realtors on a daily basis, had initiated several credit checks, and had originated the Wilde loan. *Id.* Plaintiff attached documents to this letter indicating that she had worked on the Wilde loan and had performed most of the other activities she mentioned.[4]

On December 18, 1998, Liberty Mutual responded that plaintiff's appeal was denied. *Id.*, Exhibit 8. This letter addressed, in particular, plaintiff's claim that she had worked from home. It stated:

You have admitted that you were not performing full-time work while you were out on leave. Indeed, you stated in your January 16, 1998, letter that you were restricted to bed rest and unable to work. Thus, even if you had performed some of your job functions while you were out on leave, you would not be eligible for long term disability benefits because (1) you were not performing all of the regular duties of your position on a full-time basis and (2) you were not performing the duties at your Employer's place of business.

*Id.*

Plaintiff filed suit on December 9, 1999, and filed an amended complaint on November 7, 2000. (Dockets 3 and 25). She charges defendant with wrongfully terminating her benefits in violation of ERISA, 29 U.S.C. § 1132(a)(1)(B). Defendant filed its motion for summary judgment on December 20, 2001.

### III. *DISCUSSION*

#### A. *Standard of Review*

■ Defendant's decision to terminate plaintiff's benefits will be reviewed under the deferential "arbitrary and capricious" or "abuse of discretion" standard. This stance is required when "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Pari–Fasano v.*

---

4. This paperwork showed, *inter alia*, that on January 5, 1998, plaintiff had requested a credit report on a couple potentially interested in a loan, and had filled out a Pre–Approval application with them. (Docket 35, Exhibit 5 at 165).

*ITT Hartford Life & Acc. Ins. Co.*, 230 F.3d 415, 419 (1st Cir.2000) ("where an insurance plan grants discretion to the insurer to determine eligibility for benefits, the insurer's decisions will generally be reviewed only for an abuse of that discretion.").

As noted, the Eligibility Provision of the Plan provides that "[w]hether an Eligible Employee becomes a Participant (and when coverage commences) shall be determined by the Plan Administrator in its sole discretion." (Docket 35, Exhibit 1 at 8). Later, the Plan reemphasizes that,

> The Plan Administrator shall have the exclusive right and the sole discretionary authority to interpret the terms and provisions of the Plan and to resolve all questions arising thereunder, including, without limitation, the authority to determine eligibility for Benefits and the right to resolve and remedy ambiguities, inconsistencies or omissions in the Plan
> . . . .

*Id.* at 17. This language "clearly grant[s] discretionary authority to the administrator." *Rodriguez–Abreu v. Chase Manhattan Bank*, 986 F.2d 580, 583 (1st Cir.1993). Thus, the court is at least facially required to review plaintiff's claim under the "abuse of discretion" standard.

Plaintiff tries valiantly to avoid this standard of review. She points out that there is no such discretionary language in the Summary Plan Description, or SPD. It is true, as plaintiff notes, that when there is an explicit contradiction between the SPD and the Plan itself, the language of the SPD will control. *See e.g., Gentile v. John Hancock Mut. Life Ins. Co.*, 951 F.Supp. 284, 290 (D.Mass.1997) ("general-

ly, where there is a conflict between material language of the SPD and the Master Plan, the SPD controls."). Plaintiff moves from this premise to the conclusion that if the SPD does not contain language granting discretionary authority to the plan administrator, a reviewing district court is entitled to exercise *de novo* review.[5]

This argument, unfortunately, suffers from two fatal defects. First, plaintiff cannot show, and has not attempted to show, reliance on the SPD. *See Mauser v. Raytheon Co. Pension Plan*, 239 F.3d 51, 54–55 (1st Cir.2001) (noting that plaintiff must show "significant or reasonable reliance on the Plan Summary" to obtain relief, even if the Plan Summary violates ERISA's disclosure provision). Plaintiff does not allege that she would have acted differently had she known that the Plan granted defendant discretionary authority, and thus cannot rely on the SPD for relief.

Second, there is no conflict between the language in the SPD and the Plan. The SPD is, at most, silent on the issue of discretionary authority. It nowhere indicates, even indirectly, that defendant lacks discretionary authority. Therefore, the court is bound to view this case through the "arbitrary and capricious" or "abuse of discretion" lens.

Defendant has moved for a resolution of this case under Fed.R.Civ.P. 56. "Summary judgment is appropriate when the record reveals no genuine issue as to any material fact and when the moving party is entitled to summary judgment as a matter of law." *Dandurand v. Unum Life Ins. Co. of America*, 284 F.3d 331, 335 (1st Cir.2002). A "genuine" issue is one that

---

5. Plaintiff does not also argue that the plan administrator suffered from a conflict of interest, and has not attempted to show that defendant's decision "was improperly motivated." *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir.1998). Nevertheless, it should be clear that the court has examined the record for evidence of an improper motivation on the part of defendant, and detected "no such impropriety." *Pari–Fasano*, 230 F.3d at 419.

reasonably could be resolved in favor of either party, and a "material" fact is one that affects the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The central question, then, will be whether it is clear on the undisputed facts that defendant did not abuse its discretion.

## B. *Analysis*

Defendant puts forward two main arguments in support of its decision. First, defendant claims that because plaintiff admitted to working at home, she was *automatically* ineligible for benefits. According to defendant, the fact that plaintiff was permitted to work at home, and was required to spend much of her working time out of the office, is irrelevant. The plain language of the Plan states that plaintiff is not "actively employed" unless she is working "either (i) at the Participating Employer's usual place of business, or (ii) at a location to which the Participating Employer's business requires the Employee to travel." (Docket 35, Exhibit 1 at 1). Defendant says that because plaintiff's residence did not literally qualify under either prong, plaintiff was automatically ineligible for benefits.

This argument is as untenable as it is unfair. As the testimony in this case has shown, credit officers at First Union are rarely required to be present "at the Participating Employer's usual place of business" and are almost never explicitly told to report to a specific location by their employer. Indeed, credit officers are explicitly told to be, in essence, their own boss, and to spend most of their time on the road. A credit officer who brings in loans has few other explicit obligations besides the occasional sales meeting or training seminar.

Thus, a First Union credit officer might easily work 80 hours per week for years without accumulating 90 days at the office or at "at a location to which the Participating Employer's business requires the Employee to travel." The idea that such an employee—told by First Union to work out of the office, and to manage her own schedule—would be ineligible for benefits on the basis of being out of the office is flatly untenable. "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Firestone,* 489 U.S. at 113, 109 S.Ct. 948 (quotations omitted). While other courts have upheld a denial of benefits when the employee purported to work at home, *Burnham v. Guardian Life Ins. Co. of America,* 873 F.2d 486, 487 (1st Cir. 1989) (plaintiff was Operations Manager for national distributor of food products); *Fink v. Union Central Life Ins. Co.,* 94 F.3d 489, 491 (8th Cir.1996) (plaintiff was CEO of North Dakota insurance company living semi-retired lifestyle in Arizona), none of those cases involved an employee like plaintiff who was *expected* to set her own schedule, to work nearly all of the time on the road, and to work at home. An employee with plaintiff's responsibilities must be considered to be working "at a location to which the Participating Employer's business requires the Employee to travel," whenever she is engaged in work that will produce loans. The fact that First Union never explicitly "required" its loan officers to be at a particular location cannot render them ineligible for benefits. Thus, defendant's first argument cannot help its motion for summary judgment.

■ Unfortunately for plaintiff, defendant's second argument is more compelling. Defendant contends that even if working at home was permitted under the Plan, it did not abuse its discretion when it concluded that plaintiff was not "actively employed" for three full months. This

conclusion is irresistible in view of the undisputed evidence of record.

It is true that the evidence supports a conclusion that plaintiff did everything *in her power* to maintain an active work-life in the face of her disease. Indeed, the deposition evidence paints a picture of plaintiff as nearly heroic. Plaintiff was subjected to a flare-up of an awful and debilitating condition that kept her bedridden. She had no control of her bladder, blurred vision in one of her eyes, and suffered painful muscle spasms. Yet plaintiff still, without question, managed to complete some work from home. The affidavits of Wilde and Albano make this clear.

Unhappily, however, it is impossible to conclude that defendant acted capriciously when it concluded that plaintiff was unable to maintain "active employment" for the required three months. Plaintiff was undoubtably subject to at least some days off because of her illness, and many partial days of work, despite her efforts to continue working. The day plaintiff missed the sales meeting was certainly a sick day, and defendant could reasonably conclude, given plaintiff's description of her condition in the January 16, 1998 letter, that many more sick days were also required. The January 16th letter told First Union that plaintiff had "lost vision in [her] left eye," was "unable to drive," had "no control of [her] bladder," had "acute muscle spasms at random," was "restricted to bed rest," and most importantly, was "unable to work." (Docket 35, Exhibit 11.).

The Plan is clear that sick days cannot contribute to the initial three-month requirement. As noted, it provides that,

> Coverage for an Eligible Employee shall commence on the date the Eligible Employee becomes a Participant; provided, however, that *coverage will be delayed for an Eligible Employee if he or she is not in Active Employment because of*

*Injury or Sickness.* Such coverage shall commence on the date the individual returns to Active Employment. . . .

(Docket 35, Exhibit 1 at 7) (emphasis added). Defendant was entitled to conclude that even if plaintiff was completing some work from home, she had effectively taken enough sick days in January to delay, and eventually preclude, her eligibility for coverage.

Plaintiff did present defendant with some evidence that she was working, but this evidence was not sufficient to oblige defendant to conclude that plaintiff had in fact "actively worked" for the three-month period. Plaintiff said that she kept working from home in large part through faxing realtors and potential customers. Yet plaintiff now admits that she made only nine work-related faxes over ten business days, from January 19 to January 30, 1998. Since plaintiff began work on October 27, 1997, she would have been eligible for benefits, at the earliest, on January 27, 1998, assuming *no* sick days beforehand. No fair interpretation of the record supports the conclusion that plaintiff was actively employed throughout this whole period.

Other evidence supports defendant's decision. Defendant saw that plaintiff was responsible for only one loan that closed over the entire period of her employment. Plaintiff herself explained that loan production was the best method of telling whether a loan officer was working or merely sitting at home. Defendant also noticed that plaintiff had not been to the office since December 22, 1998. Although, as noted, regular office attendance was neither required nor expected, defendant could have reasonably concluded that if plaintiff truly was actively working from home, she would have visited the office at least a few times during the month of January.

Finally, defendant's argument that it did not abuse its discretion is bolstered by its reliance on Dr. Metz. Defendant noted in its October 11, 1998 letter that it had contacted Dr. Metz, who pinpointed the onset of plaintiff's disability as January 12, 1998. This was, as defendant noted, consistent with plaintiff's description of her own condition on January 16, 1998. It therefore cannot be doubted that defendant had "substantial evidence" to support its decision to terminate benefits. *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 183 (1st Cir.1998). Defendant's decision to terminate plaintiff's benefits plainly was not an abuse of discretion. Therefore, ERISA provides plaintiff with no relief.

### IV.  *CONCLUSION*

The facts of this case are tragic, and there is no pleasure in the decision. Plaintiff's health apparently deteriorated at the worst possible time, and she responded courageously. Nevertheless, even viewing the facts most favorably to the plaintiff, the court has no power to afford plaintiff relief against defendant as a matter of law. For the reasons set forth above, defendant's motion for summary judgment (Docket No. 49) is hereby ALLOWED.

A separate Order will issue.

### *ORDER*

For the reasons stated in the accompanying Memorandum, defendant's motion for summary judgment (Docket No. 49) is hereby ALLOWED. The clerk will enter judgment for defendant.

It is so Ordered.